**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

**UNITED STATES OF AMERICA,**

             **Plaintiff,**                    **Case # 13-20052**

**-vs-**                                        **HON. JOHN CORBETT O'MEARA**

**DIANE HATHAWAY,**

             **Defendant.**
_____/

**SENTENCING MEMORANDUM
FOR DEFENDANT DIANE HATHAWAY**

**STATEMENT OF FACTS**

On January 29, 2013, Diane Hathaway pled guilty to an information charging bank fraud. Her plea was taken pursuant to a Rule 11 agreement, which provided for an advisory sentencing guideline range of either 12-18 months or 8-14 months, depending on the Court's calculation of the loss amount involved in the offense.[1]  The Rule 11 agreement also contemplated a fine not in excess of $30,000 and a restitution amount of between $40,000 and $90,000 to be determined by the Court.

The Probation Department agreed with the government's position with respect to the loss amount and calculated Ms. Hathaway's guidelines at 12-18 months based on a total offense level of 13 and a criminal history category of I.  The Probation Department accepted the government's argument that ING Bank (ING) believed that their loss was the higher amount ($90,000) and that though ING may have settled for the lower amount, the higher amount should be used.[2]

_____

[1] The government contends that the loss amount should be $90,000 (an 8-level enhancement); the defense contends that it should be $40,000 (a 6-level enhancement.  The cut-off amount between the two loss enhancements is $70,000.

[2] Pre-sentence report, §§ 28-29

The purpose of this memorandum is to urge the Court to: (a) accept the defense position that the loss amount is less than $70,000; (b) find the advisory sentencing guideline range to be 8-14 months; and (c) impose a non-jail sentence on Ms. Hathaway, based on her history and characteristics, her repayment in full of the restitution amount as found by the Court, and other factors that are present in this highly unusual case.

## DISCUSSION

It was an unlikely journey that took Diane Hathaway, the daughter of a Detroit Police lieutenant and a cook, from a working-class neighborhood on the west side of Detroit to a position on the Michigan Supreme Court.  She graduated from Detroit St. Andrews High School in 1972, and earned a certificate as a radiologic technologist from Henry Ford Hospital School of Radiology in 1974, and got married the same year.  She then worked as a radiologic technologist from 1974 until the early 1980s.

While raising two small children, she began taking college courses at Wayne State in 1982, and earned a bachelor of science degree at Madonna University in 1983 at the age of 29.[3]  She then entered the Detroit College of Law (now Michigan State College of Law) in January, 1984 and earned her law degree in January, 1987.  In the 1980s, she also obtained a real estate broker's license after attending the Macomb School of Real Estate.

Ms. Hathaway worked as an Assistant Macomb County Prosecutor from 1987-1992, when she was elected to the Wayne County Circuit Court.  She served as a circuit court judge from 1993-2008 before being elected to the Michigan Supreme Court, where she served until her retirement in December, 2012.  Her fall from the pinnacle of professional success has been swift, sudden, and tragic.

Ms. Hathaway's personal life has also been touched by tragedy.  Her mother died of lung cancer in the 1980s when Ms. Hathaway was still in her thirties.  In 2006, her sister Linda also

---

[3] She was able to complete her degree in 2½ years because she took extra credit hours each year and received a year's college credit from Madonna for the 2-year program she completed at Henry Ford Hospital.

died of lung cancer.  Her surviving sister Christine, although only 61, suffers from Alzheimer's disease.  All of these events have, of course, taken their toll and yet, as the Court can tell from the supporting letters it has received, Ms. Hathaway has continued to be a caregiver and supporting presence, not only to her own relatives but also to her friends and their relatives.

In this case, as in any case, the Court is required to examine a number of factors in determining an appropriate sentence.  Some of those are statutory, others merely human.  When all things are considered, the defense contends that all of the relevant factors support a non-jail sentence for Diane Hathaway.

### 1.  18 USC §3553(a)

18 USC §3553(a) requires a sentencing judge to consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines...;

(5) any pertinent policy statement issued by the Sentencing Commission...;

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

### A.  The nature and circumstances of the offense

In perhaps no case in recent memory have the nature and circumstances of the offense been more important and less understood.[4]  This case involves a "short sale" of Ms. Hathaway's home.  It does **not** involve a mortgage application, a home equity loan, or any other situation where a person is attempting to obtain money from a financial institution.  Rather, a short sale

---

[4] To defense counsel's knowledge, this is the first case brought in the Eastern District of Michigan where a "short seller" has been prosecuted for bank fraud.

occurs when a homeowner, whose home is nearly always "under water,"[5] is unable to make his or her mortgage payment, and seeks approval from the lender to sell the home for less than the outstanding mortgage in lieu of allowing it to proceed to foreclosure.  In a short sale situation, the homeowner receives no money; instead, the bank accepts less money for the home than the present value of its mortgage.

In this case, it is undisputed that Ms. Hathaway's home was "under water" within the traditional meaning of that term.  It is further undisputed that she failed to make her mortgage payments, and that as a result, the file had been referred to a Chicago law firm for collection of the outstanding debt.[6]  The bank then had two and only two choices: (1) foreclose on the home and sell it at a sheriff's sale; or (2) allow a short sale of the home.  Wisely, the bank chose to allow the short sale which, as will be shown later in this memorandum, allowed the bank to recoup over $150,000 **more** than it would have recovered had it chosen the foreclosure/sheriff's sale route.

None of the above is intended to suggest that Ms. Hathaway did not commit bank fraud in her short sale dealings with the bank.  She did.  As she admitted in her guilty plea, she did not provide accurate information to the bank while the short sale application was being considered, and that clearly constituted bank fraud.[7]  At the same time, in discussing the nature and circumstances of the offense, it is extremely important to note that the bank would have approved the short sale **even had they known the full extent of the assets** under Ms. Hathaway's control

---

[5] The term "under water," as used in the real estate business refers to a situation where the value of the home is less than the amount owed on the homeowner's mortgage.

[6] See Exhibit A, a June 13, 2011 Notice Pursuant to Fair Debt Collection Practices Act from the law firm Johnson, Blumberg, and Associates notifying Ms. Hathaway that the outstanding mortgage had been referred by ING Bank for collection.

[7] Although it does not change the facts as set forth in her guilty plea, it is important to note that Ms. Hathaway was represented by a lawyer during the short sale process.

at the time of the short sale.[8]  In other words, the fraud did not affect the approval of the short sale itself; rather, it involved the amount of money that the bank would have required her to bring to the closing.

The nature and circumstances of the offense, therefore, are highly unusual in that: (1) Ms. Hathaway received no money from the lender; (2) the lender agrees that it would have proceeded with the short sale regardless of Ms. Hathaway's true financial condition; and (3) the only subject in dispute is the amount that Ms. Hathaway would have been required to bring to closing had the true facts been known.   And the unusual nature and circumstances of the offense mitigate in favor of a non-jail sentence.[9]

### B.   The history and characteristics of the defendant

In addition to what was chronicled earlier in this memorandum regarding her life story, the history and characteristics of Diane Hathaway are best summarized by the supporting letters written by her friends and relatives. Her former sister-in-law wrote of the support and devotion she offered to her sister during her losing struggle with cancer.[10]  A niece described her assistance in taking care of her other sister, who is in the final stage of Alzheimer's disease.[11]  A friend told of the comfort offered to her by Ms. Hathaway during her own medical problems and the long illnesses of her parents.[12]   Two other former in-laws wrote of her compassion in helping them through the deaths of their parents within months of each other a few years ago.[13]   And a

---

[8] See Exhibit B, a January 2, 2013 letter from ING Direct to AUSA Lemisch

[9] The Court might also note that the parties agreed in the Rule 11 agreement that the conduct at issue in this case involved Ms. Hathaway's private conduct and had nothing to do with her position as a judge.

[10] See Exhibit F

[11] See Exhibit G

[12] See Exhibit H

[13] See Exhibits I and J

neighbor with a special needs child talked of Ms. Hathaway's relationship with him, and how she treated him as if he were her own.[14]

These letters, and many more like them, describe a thoughtful, kind, generous, caring person whose many accomplishments in life are actually dwarfed by her contributions to others and to society as a whole.

### C.   The kinds of sentences available

If the Court agrees with the government that the proper sentencing guideline range is 12-18 months (Zone C of the sentencing guidelines), and declines to grant a variance, the minimum term may be satisfied by a sentence of imprisonment that includes a term of supervised release that substitutes community confinement or home detention for imprisonment, provided that one-half the minimum term is satisfied by imprisonment.

If the Court agrees with the defense that the proper sentencing guideline range is 8-14 months (Zone B of the sentencing guidelines), and declines to grant a variance, the minimum term may be satisfied by a sentence of imprisonment that includes a term of supervised release with a condition that substitutes community confinement or home detention for imprisonment, provided that at least one month is satisfied by imprisonment.

Of course, the defense contends that for a number of valid reasons, the Court should grant a variance from whatever guideline range it decides is applicable, and sentence Ms. Hathaway to a non-jail sentence.  If the Court agrees with the reasoning of the defense, only a small variance will be necessary to impose such a sentence.

### D.   The sentencing guideline range

The only disputed issue with respect to the sentencing guideline range is the loss amount, which the parties agree should fall within a range of $40,000 to $90,000.  The government contends that Ms. Hathaway's sentencing guideline range should be 12-18 months based on a

---

[14] Exhibit K

loss amount of $90,000.  The defense contends that the range should be 8-14 months based on a loss amount of $40,000.  The cutoff figure between the two guideline ranges is $70,000, meaning that if the Court does not find by a preponderance of the evidence that the loss to the bank exceeded $70,000, it will accept the 8-14 months guidelines as calculated by the defense.

ING Bank submitted two letters to the government concerning this issue.[15]   In the first letter, the Bank indicated that "the **loss** to ING resulting from the conduct of Hathaway....was between $40,000 and $90,000."  The Bank provided no supporting documentation for those figures nor did it claim in any way that one figure was any more accurate than the other.   Based on that letter, which merely gave a range for the loss, there was no way for the government to prove by a preponderance of the evidence that the loss amount should be found to be in excess of $70,000, the cut-off number for guideline purposes.

Almost three months later, the Bank sent a second letter purporting to "clarify" the first letter.  In that letter, the Bank indicated that the $90,000 figure ($100,00 less the $10,000 that Ms. Hathaway brought to the closing) represented the "Bank's valuation of the....legal claim it would have had against Hathaway....if [she] defaulted on the mortgage loan."  It went on to say that the $40,000 figure ($50,000 minus the $10,000 brought to the closing) "does not represent the Bank's valuation of the.....claim."  It concluded by saying that the $40,000 figure "represents the lowest amount the Bank would accept, **as a business decision**, to release a legal claim that the Bank valued at $100,000.

What is noticeably absent from the Bank's second letter is any mention of the word "loss."  Unlike the first letter, which specifically addresses the subject of loss to the Bank, and assesses a specific range ($40-90,000) for that loss, the second letter merely speaks of "valuation" and "business decisions."  While the letter indicates that the Bank considered other factors, such as litigation costs, it does not simply come out and state that the Bank suffered a

---

[15] See Exhibit B, the previously referenced letter dated January 2, 2013, and Exhibit C, a second letter to AUSA Lemisch dated March 25, 2013.

loss of $90,000, nor does it attempt to prove that number in any way, shape, or form.

The truth of the matter is that the Bank clearly does not really know the amount of the loss in this matter; hence, the first letter, which merely sets forth a range. And the second letter, which fails to even address the subject of loss, does nothing which should cause the Court to conclude that a loss amount in excess of $70,000 has been proven by a preponderance of the evidence.[16]

There are additional facts to consider when determining the loss amount to the Bank. As stated earlier, once it became obvious that Ms. Hathaway could no longer pay the mortgage, the Bank essentially had two choices;  it could proceed to foreclosure and a subsequent sheriff's sale or it could approve the short sale. Although it is intuitive that the proceeds from a sheriff's sale would be less than the proceeds from a short sale, the Court does not have to rely on its intuition to come to that conclusion. Instead, it can rely on the opinions of two people from entirely different backgrounds who came to the same conclusion.

First, the Court may rely on an affidavit from Philip Seaver, the president of Seaver Title Agency who reviewed the relevant documents .[17]  In his affidavit, Mr. Seaver, whose short-sale department has processed over 2,000 short -sale transactions since 2008, states that he has reviewed ING's "Net Return on Sale" form[18] and found that ING concluded that the Bank recovered $156,633.46 more by approving the short sale than it would have received had the home been sold at a sheriff's sale.

Mr. Seaver's conclusion was echoed by Ana Martinez, the ING employee who recommended in the Net Return on Sale Form that the short sale be approved **to "prevent the**

---

[16] If the Court, for instance, were to decide to split the difference between the top and the bottom of the loss amount range, that figure would be $65,000, which is underneath the $70,000 cut-off figure, thus resulting in a guideline range of 8-14 months.

[17] See Exhibit D, Affidavit of Philip R. Seaver

[18] See Exhibit E, Net Return on Sale form

**foreclosure sale date of [November] 10.**"  She further indicated that the "recovery to RMV (real market value) of 93.53% is in our best interest due to the continuing decline of home values in Wayne County, MI."[19]  Therefore, given the fact that the Bank employee assigned to the file and an independent title insurance company owner agree that the proceeds from the short sale were in excess of $150,000 more than the Bank would have received at a sheriff's sale, the Court should have no trouble concluding that the short sale was in the Bank's best interest.

Therefore, given the fact that the Bank has provided no proof of loss other than the January 2, 2013 letter estimating the loss at between $40,000 and $90,000, and given the additional fact that the Bank recovered over $150,000 more from the short sale than it would have received at a sheriff's sale, the Court should find that the loss amount did not exceed $70,000 and calculate Ms. Hathaway's sentencing guideline range at 8-14 months.

### E.   The need to avoid unwarranted sentencing disparities

The defense agrees with the Probation Department that since there are no co-defendants in this matter, there is no issue as to sentencing disparity.  And, as noted in an earlier footnote, since defense counsel has been unable to find any other cases in this District where a "short sale" seller has been charged with bank fraud, there are no other defendants to whom Ms. Hathaway's conduct can be compared.

### F.   The need to provide restitution

The Rule agreement in this case provides that Ms. Hathaway will make restitution to ING Bank (or its successor) on the date of sentencing.  By agreement of the parties, that amount will be a figure within the range of $40,000 to $90,000. The parties further agreed that the final restitution amount will be determined by the Court.  When the Court makes that determination at sentencing, Ms. Hathaway will be prepared to pay the restitution in full.  Therefore, the statutory condition regarding restitution will be fully satisfied on the date of sentencing.

---

[19] See Exhibit E, "Recommendation" section

As the Court knows from its experience, it is highly unusual for defendants to **ever** pay restitution in full, let alone immediately on the date of sentencing.  And that is another reason why the Court should sentence Ms. Hathaway to a non-jail sentence.

**2.  United States Supreme Court case law**

In <u>United States v Booker</u>, 543 US 220 (2005), the United States Supreme Court found those provisions of the Federal Sentencing Reform Act of 1984 that make the guidelines mandatory,[20] or which rely upon the Guidelines's mandatory nature,[21] incompatible with its Sixth Amendment holding in <u>Blakely v Washington</u>, 542 US 296 (2004).  Accordingly, the Court severed and excised those provisions, "mak[ing] the Guidelines effectively advisory." Therefore, instead of being bound by mandatory sentencing guidelines, <u>Booker</u>  merely required a sentencing judge to first consider the guideline range and then impose a reasonable sentence pursuant to 18 USC §3553(a).

The sentencing guidelines were again discussed by the Court in <u>Gall v United States</u>, 128 S Ct 586 (2007).  In <u>Gall</u>, the Court set forth a number of important principles.  First, the Court made clear that the sentencing guidelines are merely advisory and that appellate review is limited to the issue of "reasonableness:"

> As a result of our decision [in <u>Booker</u>], the Guidelines are now advisory, and appellate review of sentencing decisions is limited to determining whether they are "reasonable." Our explanation of "reasonableness" review in the <u>Booker</u> opinion made it pellucidly clear that the familiar abuse-of-discretion standard of review now applies to appellate review of sentencing decisions.  <u>Id</u>.

Second, it is equally clear that the sentencing judge must explain his or her reasons for departing from the guidelines:

> It is also clear that a district judge must give serious consideration to the extent of any departure from the Guidelines and must explain his conclusion that an unusually lenient or an unusually harsh sentence

---

[20]18 USC §3553(b)(1)

[21]18 USC §3742(e)

is appropriate in a particular case with sufficient justifications.  Id.

Third, the opinion placed certain restrictions on the extent of appellate review of a sentence outside the advisory guideline range, and specifically disapproved of certain criteria that had been utilized since <u>Booker</u>:

> In reviewing the reasonableness of a sentence outside the Guidelines range, appellate courts may therefore take the degree of variance into account and consider the extent of a deviation from the Guidelines. We reject, however, an appellate rule that requires "extraordinary" circumstances to justify a sentence outside the Guidelines range. We also reject the use of a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence.

Fourth, while the Court had permitted the circuit courts to adopt a presumption of reasonableness for sentences within the guideline range, it did not follow that those courts could adopt a presumption of unreasonableness for sentences outside the range:

> As an initial matter, the approaches we reject come too close to creating an impermissible presumption of unreasonableness for sentences outside the Guidelines range.....Even the Government has acknowledged that such a presumption would not be consistent with <u>Booker</u>.

Finally, the Court gave its reasons for its rejection of the "mathematical approach:"

> The mathematical approach also suffers from infirmities of application. On one side of the equation, deviations from the Guidelines range will always appear more extreme -- in percentage terms -- when the range itself is low, and a sentence of probation will always be a 100% departure regardless of whether the Guidelines range is 1 month or 100 years. Moreover, quantifying the variance as a certain percentage of the maximum, minimum, or median prison sentence recommended by the Guidelines gives no weight to the "substantial restriction of freedom" involved in a term of supervised release or probation.
>
> Most importantly, both the exceptional circumstances requirement and the rigid mathematical formulation reflect a practice -- common among courts that have adopted "proportional review" -- of applying a heightened standard of review to sentences outside the Guidelines range. This is inconsistent with the rule that the abuse-of-discretion standard of review applies to appellate review of all sentencing decisions -- whether inside or outside the Guidelines range.

With its decision in <u>Gall</u>, the Supreme Court laid to rest any argument whatsoever that

-11-

trial judges are required to impose sentences within the sentencing guideline range.  Sentencing guidelines are merely advisory.  Courts are to impose reasonable sentences consistent with the principles set forth in the sentencing statute.  And appellate courts are to review sentences using a reasonableness standard.  End of story.

### 3.  Sentencing variance

18 USC §3553(a)  requires a sentencing judge to "impose a sentence sufficient, **but not greater than necessary**, to comply with the purposes set forth in paragraph (2) of this subsection."  (Emphasis added).  Subsection (2) states that such purposes are:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant;  and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner**.**

With respect to subsection (A), this offense, while admittedly serious, is hardly a threat to "the security and stability of the lending industry" as the Probation Department contends.  Without reiterating all of the facts set forth earlier in this memorandum, suffice it to say that the Bank has conceded: (a) that it would have approved the short sale even if Ms. Hathaway's assets had been stated accurately; and (b) that its total loss did not exceed $90,000.   Serious offense, yes; threat to the security and stability of the banking system, no.

There are, on the other hand, a number of §3553(a) factors that might lead the Court to conclude that a sentencing variance is appropriate in this case.  In the pre-sentence report, the Probation department indicated that because of Ms. Hathaway's age, lack of criminal history, physical and mental stability, and educational background, there is little possibility of recidivism or violent behavior, and no need for educational or vocational training.[22]   And those are certainly

---

[22] Pre-sentence report, p 17, §§92-94

things that the Court may consider pursuant to §3553(a)(1) and (a)(2) in granting a variance from the sentencing guidelines.

Judges may impose sentences that vary from the guidelines as long as those sentences are reasonable, and variances are to be considered without regard to whether or not the defendant cooperated with the government.  In this case, Ms. Hathaway did cooperate not only with the government but also with the criminal justice system by entering a pre-indictment plea to an information, thus allowing this case to be resolved quickly and without a trial.  By doing so, she spared the Court and the public the circus-like atmosphere that inevitably prevails when a public official goes on trial.  And that, as recent events have shown, is something that the Court should consider in her favor.

### 4. Extent of variance from the guidelines

When a trial judge grants a variance at sentencing, an issue may arise at times as to the permissible extent of the variance.  One case that is helpful as to this issue is United States v Husein, 478 F 3d 318 (6th Cir. 2007), an appeal of a sentencing decision by Judge Roberts of the Eastern District of Michigan.  Although Husein presents a different set of facts,[23] the Sixth Circuit's language rings true in the instant case as well:

> We also recognize that, as in Fuson, this case "approach[es] the boundary of the district court's broader sentencing discretion under Booker."[24] But the plain import of Booker is that a 1-day, below-the-Guidelines sentence, no less than a 7,300-day, above-the-Guidelines sentence, is now a viable sentence for a district court to impose so long as it is authorized by statute and reasonable within the meaning of 18 U.S.C. § 3553(a). Cf. United States v. Booker, 543 U.S. 220, 264 (2005)
>
> ("[T]he [Sentencing Reform] Act without its mandatory provision . . . remains consistent with Congress' initial and basic sentencing intent[:] to provide certainty and fairness . . . avoid unwarranted sentencing disparities . . . and [yet] maintain sufficient flexibility to permit

---

[23] Ms. Husein was convicted of distribution of ecstasy.  Her sentencing guideline range was 37-46 months.  She did not cooperate nor was a §5K1.1 motion filed by the government.  Judge Roberts sentenced her to one day in custody, three years supervised release, and 270 days home confinement.

[24] The Husein case was decided after Booker, but before Gall.

individualized sentences where warranted."). Because Husein's
sentence both falls within the statutory range and survives reasonableness
review as defined by the law of this circuit..., we find no abuse of the
district court's <u>Booker</u> discretion under the unique facts of this case.

The same logic should apply in the instant case.  While there well may be a "boundary"
of this Court's sentencing discretion under <u>Booker</u> and <u>Gall</u>, that boundary is determined under a
reasonableness standard.  And given Ms. Hathaway's history and characteristics, as well as the
other factors discussed in this memorandum, this Court has wide latitude to impose a sentence
that is both fair and reasonable under all the circumstances and consistent with the law.

### 5. Sentencing alternatives

In the bad old days of sentencing, courts were basically forced to choose between sending
a defendant to prison or placing him on straight probation.  Fortunately, those days are long gone
and sentencing judges now have a variety of alternatives available to them.  In the instant case,
the societal value of sending Ms. Hathaway to prison is dubious at best. There is no reason that
she cannot continue to be an asset to society through community service that would utilize her
talents in a positive way.

For instance, the Court has received a letter from the president of The Lake House, a
charitable organization whose mission is "to provide a safe harbor to support, educate, and
empower those touched by cancer."[25]  What better way for Ms. Hathaway to give back to her
fellow citizens than to work as a volunteer assisting cancer patients, particularly given her own
experience with her sister who suffered from the disease?

Another alternative method of community service might be at a homeless shelter called
Matthew's Hope in Wintergarden, FL, near where Ms. Hathaway hopes to live.  She has been in
contact with Michelle Lucy, the director of the shelter, and offered her services there.  Because
interior design is one of Ms. Hathaway's many talents, she would be a wonderful addition to that

---

[25] See Exhibit L.

organization.[26]

### 6. Jail vs. non-jail sentence

At the end of the day, what would be gained by a prison sentence for Ms. Hathaway? And who would benefit?  The argument has been made by some in the media that she must receive a prison sentence because of her former position as a judge.  Would it be fair to deny her a variance that is clearly justified by the facts and circumstances of the case for that reason alone? For one thing, that argument ignores the punishment that she has already received precisely because she was a judge.  She has lost a job she loved, and given up her law and real estate licenses.  She has been publicly humiliated, and subjected to such media harassment that her husband had to call the police after one of the television stations shined a spotlight into their living room for over half an hour.  She and her family were so embarrassed that she stopped going to social gatherings and eventually left the state between her plea and sentencing to avoid the media attention, hardly seeing her children and grandchildren for the past four months.  And unlike nearly every other criminal defendant, she  has asked her friends and children **not** to attend her sentencing because of her fear that they will be tormented by the media.

Finally, Ms. Hathaway will inevitably suffer most and longest because of the damage to her previously unblemished reputation.  For all the good that she has done throughout her fifty-nine years on this earth, she will always be remembered for the one bad thing that she did.  And she and her family will live with that for many years to come.

This Court has a well-deserved reputation for fairness in sentencing.  Although there may be those who are clamoring for a prison sentence, a non-prison sentence would be more consistent with the facts and circumstances of the case and the interests of justice than sending Ms. Hathaway to prison.  A non-prison sentence would also satisfy the purposes of 18 USC §3553(a).  It would be difficult, for instance, to argue that a sentence that included electronic

---

[26] Of course, Ms. Hathaway would be willing and able to perform any other type of community service suggested by the Probation Department.

monitoring, community service, a fine of up to $30,000, and the immediate repayment of restitution to the Bank did not  "reflect the seriousness of the offense" or "provide just punishment for the offense." Nor could it be said that such a sentence would not "afford adequate deterrence to criminal conduct."

## CONCLUSION

Therefore, based upon consideration of the factors set forth in §3553(a) , coupled with the statutory directive of §3553(a) that "the court shall impose a sentence, sufficient but not greater than necessary to comply with the purposes set forth in 18 U.S.C. §3553(a)(2), the defense requests that this Court impose a non-jail sentence on Ms. Hathaway.

Respectfully submitted,

s/ Steven Fishman
Steven Fishman (P23049)
Attorney for Defendant Hathaway
615 Griswold, Suite #1125
Detroit, MI 48226
(313)962-4090
e-mail: sfish66@yahoo.com

Dated: May 20, 2013

-16-

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on May 20, 2013, I served a copy of this Sentencing Memorandum upon Daniel Lemisch, AUSA, by filing same with the Court electronically and by email.


<u>s/ Steven Fishman</u>
Steven Fishman
Attorney for Defendant Hathaway