UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,             Case No. 13-cr-20052

v.                                    Honorable John Corbett O'Meara

                                      Offense: 18 U.S.C. § 1344, Bank Fraud

D-1  DIANE MARIE HATHAWAY,

        Defendant.

_____/

## UNITED STATES' SENTENCING MEMORANDUM

       The United States of America, through its undersigned counsel, recommends that the Court sentence defendant Diane Marie Hathaway to a sentence of imprisonment within the Sentencing Guidelines range of 12 to 18 months, as calculated by the government and the United States Probation Department.

### BACKGROUND

       On January 29, 2013, defendant Hathaway pleaded guilty to engaging in a nearly two-year scheme to defraud ING Direct ("ING"), a financial institution as defined by 18 U.S.C. § 20, in order to obtain approval for the short sale of her residence, located at 15834 Lakeview Court, Grosse Pointe Park, Michigan (the "Lakeview Court Property").

       From December 2008 until November 2011, defendant Hathaway engaged in negotiations with ING to gain approval to conduct a short sale of the Lakeview Court Property. (PSR ¶¶ 6–24.)  On December 10, 2010, defendant Hathaway submitted an application for such

short sale to ING. On this application, defendant Hathaway claimed that (i) her assets in investment and bank accounts were worth "approximately $10,000" and (ii) her assets in retirement accounts were worth "approximately $350,000." (PSR ¶ 13.)

These claims were false—undervaluing the defendant's assets by approximately $389,000. (*See* PSR ¶ 14.) The defendant also failed to disclose, as an asset under her control, the property located at 2709 Butler Bay Drive North, Windermere, Florida (the "Florida Property") that the defendant and her husband purchased on January 18, 1999 for approximately $423,000. (PSR ¶¶ 13, 20.) Based on tax records, the fair market value of the Florida Property in 2010 was $664,683 (the Florida Property was not encumbered by mortgage or other debt). (PSR ¶ 20.) Accordingly, the defendant, in an attempt to gain approval from ING for approximately $601,000 in debt relief via a short sale, intentionally failed to disclose assets worth more than $1,000,000—enough to pay the ING mortgage debt in full and retain over $400,000 worth in assets. (*See* PSR ¶¶ 14, 20.)

The defendant did not simply lie about the value of her assets and fail to disclose ownership of the Florida Property. The defendant went to great effort to hide these assets from ING. The defendant attempted to hide the Florida Property from ING by transferring the property to the defendant's stepdaughter for $10. (PSR ¶ 20.) This transfer occurred in March 2010, while the defendant was in short sale negotiations with ING. The defendant's stepdaughter never resided at the Florida Property (or paid utility or tax bills). (*Id.*)

The defendant also attempted to hide her investment and bank account assets by (i) siphoning assets from her retirement accounts, investment accounts, and personal bank accounts, (ii) using such assets to purchase and stockpile official bank checks payable to her, and

(iii) purchasing real property with the official bank checks—real property that was ultimately placed in the name of one of her stepchildren.  (PSR ¶ 15.)

From January 26, 2010 through April 16, 2010, the defendant, with the intent to defraud, siphoned $201,487.39 from her bank and investment accounts.  These funds were used to purchase official bank checks payable to the defendant.  (*Id.*)  The official bank checks (totaling $201,487.39) were not deposited into any account; instead, on April 16, 2010, the defendant used $161,148.16 derived from the official bank checks to purchase the property located at 15812-14 Windmill Pointe, Grosse Pointe Park, Michigan (the "Windmill Pointe Property").  (PSR ¶ 22.)  Ownership of this property was transferred to the defendant's stepson for $100 in September 2010.  (*Id.*)

Between April 16, 2010 and December 10, 2010, the defendant was able to siphon additional money from her accounts and accumulate a total of $195,587.69 in official bank checks payable to the defendant.  Because official bank checks are only valid for 60 days, the defendant, with the intent to defraud, went to the trouble of renewing the official bank checks before they expired.  (PSR ¶ 15.)  On March 31, 2011, the defendant used official bank checks worth $195,000 to purchase 1030 Balfour Street, Grosse Pointe Park, Michigan (the "Balfour Property") in the name of her stepdaughter.  (PSR ¶ 16.)

The short sale of the Lakeview Court Property was approved in October 2011, and closed in November 2011 (the defendant was forgiven of $664,510.67 in debt).  (PSR ¶ 24.)  After the short sale was approved and completed, the Balfour Property and the Florida Property were transferred back to the defendant in furtherance of the scheme to defraud.  On December 1, 2011, the defendant's stepdaughter transferred the Balfour Property back to the defendant for less than

$100.  (PSR ¶ 25.)  And on March 5, 2012, the defendant's stepdaughter transferred the Florida Property back to the defendant for $10.  (PSR ¶ 26.)

## ARGUMENT

**I.    SENTENCING GUIDELINES CALCULATIONS**

"The Guidelines should be the starting point and the initial benchmark in determining a sentence and a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."  *United States v. Lalonde*, 509 F.3d 750, 763 (6th Cir. 2007) (quoting *Gall v. United States*, 128 S.Ct. 586, 601 (2007) (internal quotations omitted)).

As stated in the Rule 11 Plea Agreement, the government's recommended Guidelines range is 12 to 18 months, which is based on an amount of loss greater than $70,000.  The Probation Department concurs with the government's recommended Guidelines range and loss calculation.  (PSR ¶¶ 29,73.)  The defendant disagrees with the government's recommended Guidelines range, and argues that the Guidelines range should be 8 to 14 months—the different Guidelines range is based solely on the defendant's position that the amount of loss is greater than $30,000 (but less than $70,000).  (PSR ¶ 28.)

Because this is a fraud case, the calculation of defendant Hathaway's sentence is controlled by U.S.S.G. §2B1.1.  The loss calculation is a two-step process and, due to difficulties often associated with loss calculations in fraud cases, this Court "need only make a reasonable estimate of the loss."  U.S.S.G. § 2B1.1 cmt. n.3 (C); *United States v. Rothwell*, 387 F.3d 579 (6th Cir. 2004).  <u>First</u>, the Court is to calculate the "actual" or "intended" loss.[1]  <u>Second</u>, the

---

[1] The Court is to apply the "greater of actual or intended loss."  U.S.S.G. § 2B1.1 cmt. n.3(A).  Because the government does not seek to offer proof concerning defendant Hathaway's

4

Court determines if there are any applicable credits against "actual loss" to arrive at the final loss figure for purposes of the loss enhancement under U.S.S.G. § 2B1.1(b)(1).

### A. Actual Loss Is the Value of the Released Legal Claim

"Actual loss" is "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1 cmt. n.3(A)(I). The reasonably foreseeable pecuniary harm that resulted from the offense is pecuniary harm "that the defendant knew or, under the circumstances, reasonably should have known was a potential result of the offense." *Id*. at comment n.3(A)(iv).

In a typical mortgage fraud case, the principal amount of a mortgage loan is reasonably foreseeable pecuniary harm because a lender's loss of this amount is a foreseeable result of a scheme that involves fraud committed during the loan application process. *United States v. Minor*, 488 Fed.Appx. 966, 969 (6th Cir. 2012) (unpublished) ("The 'reasonably foreseeable pecuniary harm' in this case is the amount of the mortgage loans"). In this short sale fraud case, it is the government's position that the reasonably foreseeable pecuniary harm is the value of the legal claim that the defendant knew ING would release as a result of a short sale. [2]

---

intent at sentencing, the government will focus its argument on "actual loss" alone.

[2] If a borrower defaults on a mortgage loan, a lender typically forecloses on the property at issue (collateral), sells the collateral, and is left with a legal claim against the borrower for the difference between the outstanding mortgage loan debt and the amount recovered by the sale of collateral. A short sale is different because, after such a sale is conducted, a lender does not have a legal claim to recover any outstanding debt.

When a short sale is conducted, a lender enters into an agreement with the borrower to (i) allow the sale of a property (which is collateral underlying a mortgage loan) for an amount less than the outstanding mortgage loan debt, and (ii) accept a "short fall payment" from the borrower as consideration for the release of the lender's legal claim against the borrower for any outstanding mortgage loan debt. Accordingly, the amount of the "short fall payment" is based on the lender's valuation of the legal claim it is releasing.

ING valued the approximately $600,000 legal claim it agreed to release against defendant Hathaway at $100,000. (March 25, 2013 Ltr. from Joe Wescott, attached hereto as Ex. A.) "This valuation takes into account a number of factors, including litigation costs, the amount and type of available assets, and state collection laws." (*Id.*)

The defendant argues that loss should be $40,000 (which is based on valuing the released legal claim at $50,000 and giving a $10,000 credit for the "short fall payment" that was made). (PSR ¶ 28.). This argument is based on ING's statement that, had it "known the full extent of the assets under the control of Hathaway and Kingsley at the time [it] approved the short sale, [ING] would have required Hathaway and Kingsley to personally contribute [a "short fall payment" of] $50,000 to $100,000 to the closing." (*See* PSR ¶ 28; Jan. 2, 2013 Ltr. from Joe Wescott, attached hereto as Ex. B.)

The $50,000 figure, however, is not based on the valuation of the released legal claim. According to ING, "this figure represents the lowest amount [it] would accept, as a business decision, to release a legal claim that [it] valued at $100,000." (Ex. A.) A business decision to settle a claim (for less than the claim is actually worth) is irrelevant to loss calculation. *See United States v. Masek*, 588 F.3d 1283, 1289–90 (10th Cir. 2009) (rejecting argument that loss under U.S.S.G. § 2B1.1 should be capped at the amount of a civil settlement and noting that settlement amounts may be based on "avoid[ing] the costs of trial" or estimations that an individual may "be judgment proof beyond the settlement amount"). Accordingly, actual loss under U.S.S.G. §2B1.1 is $100,000.[3]

---

[3] Defendant Hathaway argues that in determining loss amount, this Court should consider how her fraudulent criminal activity served to benefit the victim financial institution—suggesting

### B. The Defendant Should Receive a $10,000 Credit Against Actual Loss

The defendant did make a "short fall payment" of $10,000 prior to the detection of this crime. Under U.S.S.G. § 2B1.1, App. Note. 3(E)(ii), the defendant should receive credit for this $10,000 payment, yielding a total loss amount of $90,000—which corresponds to a 8-point increase under U.S.S.G. § 2B1.1(b)(1)(E) based on a loss amount greater than $70,000.

## III. SECTION 3553(a) SENTENCING FACTORS

In determining the appropriate sentence, the Court should not simply rely on the Guideline calculations, but should consider all of the factors in the Sentencing Reform Act and, in particular, those set forth in 18 U.S.C. § 3553(a). These factors include (i) the history and characteristics of the defendant; (ii) the need for the sentence imposed to reflect the seriousness of the offense and provide just punishment for the offense, and (iii) the need for the sentence imposed to afford adequate deterrence to criminal conduct.

### A. History and Characteristics of Defendant Hathaway

The defendant is a college and law school graduate. (PSR ¶¶ 61–62.) In addition, the defendant attended the Macomb School of Real Estate in the late 1980s and obtained a real estate broker's license, which is remains active today. (PSR ¶ 63.)

From 1987 to 1992, the defendant was an Assistant Macomb County Prosecutor. From

---

that ING "recovered $156,633.46 more by approving the short sale then it would have received" had there been foreclosure proceedings. (Def.'s Sentencing Mem. at 8.) This type of argument has been rejected by the Sixth Circuit. *C.f.*, *United States v. Driver*, 132 F.3d 34, at *4–*6 (6th Cir. 1997) (affirming district court's decision not to reduce loss amount by any tax benefit received by the victim as a result of the loss caused by the defendant's criminal activity) (citing *Unites States v. Wolfe*, 71 F.3d 611, 617–19 (6th Cir. 1995) and *United States v. McAlpine*, 32 F.3d 484, 489 (10th Cir. 1994)); *see also United States v. Harris*, 38 F.3d 95, 99 (2nd Cir. 1994) ("we reject credit for any tax deductions that could be taken by the victims").

January 1, 1993 until December 31, 2008, the defendant was a circuit court judge with the Wayne County Third Judicial Circuit Court. (PSR ¶ 67.) The defendant moved on from that position to become a justice on the Michigan Supreme Court, a position the defendant held from January 1, 2009 until January 21, 2013. (PSR ¶ 66.) And as a Michigan Supreme Court Justice, the defendant was the only justice assigned the duty of overseeing the attorney disciplinary system for the State of Michigan.

The defendant has been described as "industrious and smart." (PSR ¶ 50.) She is certainly accomplished. Given the defendant's (i) obvious knowledge of the law from serving approximately five years as a prosecutor and over twenty years on the bench, and (ii) her knowledge of real estate transactions as a licensed broker since the late 1980s, the defendant made a well informed decision to commit bank fraud for her financial benefit.

### B. Deterrence and Just Punishment

The defendant's criminal activities occurred over the course of over two years and resulted in approximately $100,000 in losses to a federally insured financial institution. This was not a crime resulting from a single decision or a momentary impulse. This was a calculated crime that was committed over a significant period of time and involved the use of the defendant's own stepchildren to aid in the concealment of assets. In order to perpetuate this criminal activity, multiple discrete acts and decisions were required. And, based on her experience in real estate and the law as noted above, defendant Hathaway knew the criminal nature of her conduct.

This is why white collar crime is so serious. It is the essence of an intentional crime. It is orchestrated. It is coordinated and planned. It is methodical. As is the case here, it is not a

crime generally motivated by the need to feed a family, but rather driven by the greed to obtain even more—crime committed by those with means. (*See* PSR ¶ 69.)

In white-collar prosecutions, the sentence imposed is important to promote respect for the law and to deter the defendant and the general public from committing similar crimes in the future. Given the difficulties of uncovering and prosecuting this type of fraud, the deterrent impact of prison sentences is important to the mission of law enforcement and the financial integrity of financial institutions. The Eleventh Circuit emphasized the important role that prison sentences have in deterring white-collar crime in *United States v. Martin* when it recognized that "[b]ecause economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." 455 F.3d 1227, 1240 (11th Cir. 2006) (internal citations omitted).

With this in mind, a sentence of imprisonment of within the Guidelines range of 12 to 18 months is necessary. Such a sentence would serve to adequately punish the defendant for her methodical, thoughtful, and sophisticated criminal conduct that spanned over two years and caused approximately $100,000 in losses to a financial institution. In addition, this sentence would deter the defendant and others from future criminal conduct and, in particular, economic crime.

      C.      **The Seriousness of the Offense and the Types of Sentences Available**

The defendant's criminal activity was not the result of a single bad decision or a momentary lapse of judgment. As noted above, the defendant's criminal activities occurred over a significant period of time, involved countless acts and decisions (as well as the use of the defendant's own stepchildren), and resulted is significant losses to financial institutions. This

9

offense was serious, and the defendant played the major role in it.

## **CONCLUSION**

For all of the above reasons, the government respectfully recommends that the Court impose a sentence of between 12 and 18 months in prison—a sentence within the Guidelines range as calculated by the U.S. Probation department and the government.

Respectfully submitted,

Barbara L. McQuade
United States Attorney


 /s/Daniel L. Lemisch
Daniel L. Lemisch
Assistant United States Attorney
211 W. Fort St., Suite 2001
Detroit, Michigan  48226
Telephone:  (313) 226-9776
E-mail: daniel.lemisch@usdoj.gov

 /s/Patrick J. Hurford
Patrick J. Hurford
Assistant United States Attorney
211 W. Fort St., Suite 2001
Detroit, Michigan  48226
Telephone:  (313) 226-9553
E-mail: patrick.hurford@usdoj.gov


Dated:  May 23, 2013

## CERTIFICATE OF SERVICE

       I hereby certify that on <u>May 23, 2013</u>, I filed the foregoing document on the ECF system, which will send notice to all parties of record.

                                              /s/ Patrick J. Hurford
                                              Patrick J. Hurford
                                              Assistant U.S. Attorney
                                              211 W. Fort Street, Suite 2001
                                              Detroit, MI 48226
                                              (313) 226-9553
                                              patrick.hurford@usdoj.gov